## REBECCA E. SELF *v.* THE STATE.

1. MURDER. *Accessory before the fact. What proof is necessary.* Upon the trial of an accessory before the fact, the principal not having been previously convicted, the first thing which devolves upon the prosecution is to prove before the jury that the principal was guilty of the murder, and that his crime was murder in the first degree. This proof is a necessary prerequisite to the conviction of the defendant as an accessory before the fact.

2. COMPETENCY OF PREVIOUS DECLARATIONS AND THREATS OF THE PRINCIPAL. It results from the nature of the case, involving as it does a double trial, that in ascertaining the guilt of the principal, which is the preliminary inquiry, the same evidence is competent that would be admitted if the principal were on trial. The declarations and threats of the principal, made before the deed was committed, are competent; not because they fix guilt upon the defendant as accessory, but because they look to the guilt of the principal.

   Cases cited: Hensley *v.* The State, 9 Hum., 243; Sible *v.* The State, 3 Heis., 137.

3. CONFESSION OF DEFENDANT. Where the defendant was under arrest on a charge of being implicated in the murder, and was so situated that she could see and understand the excited temper of the crowd which surrounded her, and where the sheriff excited in her fears of imminent danger, but held out obscurely that there was hope in an immediate confession: *Held,* that the court below erred in admitting the confession as competent evidence.

---

### FROM WASHINGTON.

---

From the Circuit Court. E. E. GILLENWATERS, Judge.

INGERSOLL for defendant.

ATTORNEY-GENERAL HEISKELL for State.

NICHOLSON, C. J., delivered the opinion of the court

Self *v.* The State.

Rebecca E. Self was indicted in the Circuit Court of Greene county as an accessory before the fact to the murder of Jas. G. Mason by George Simpson, and upon a change of venue to Washington county, she was convicted and sentenced to the penitentiary for life.   She has appealed from the judgment to this court.

Upon the trial of the cause the State introduced James Fry, who testified that he was an intimate associate of George Simpson, and that during a period of several months before the burning of Mason's storehouse and his death, he had repeatedly heard Simpson threaten to burn Mason's store and kill him.   The defendant, by her counsel, objected to this testimony as · incompetent, but the objection was overruled and the evidence admitted to go to the jury; but at the time of admitting the evidence, the judge said to the jury that these statements would not be looked to by them to ascertain the fact of the homicide, but to fix the grade of the homicide if the homicide were proven by other testimony.   And in his charge the judge repeated this statement.

It is urged for defendant that the threats of George Simpson, made before the killing, were erroneously admitted in evidence for any · purpose.

It is to be observed that George Simpson, who is charged in the indictment against defendant as the murderer, was killed a few days after the murder, in an attempt to arrest him for the offense, and that defendant is prosecuted as an accessory before the fact, the principal not having been previously convicted.

The first thing, therefore, which devolved upon the prosecution, was to prove before the jury that George Simpson was guilty of the murder of Jos. G. Mason, and that his crime was murder in the first degree. The making of this proof was a necessary prerequisite to the conviction of defendant as an accessory before the fact.

It seems to be held by many respectable authorities that upon an indictment against an accessory before the fact, the confession of the principal that he was guilty of the offense cannot be given to prove the guilt of the principal, but that it must be proved *aliunde:* 1 Archb. Cr. Pr. & Pl., 84; Roscoe's Cr. Ev., 54. Upon the authority of the case of *Rex* v. *Turner,* 1 Sevier, 119, in which this doctrine was laid down, Park B., upon the trial of an accessory before the fact after the principal had been convicted and executed for murder, ordered the proceedings to be conducted in the same manner as if the principal was then on trial, and the evidence against the accessory was not gone into until the case against the principal was established: *Ratcliffe's case,* 1 Sevier, 121.

Assuming that the course of proceeding adopted by Park B. on the trial of an accessory before the fact, where the principal had been convicted and executed, is the proper one, and that proceedings should be conducted as if the principal was again on trial, it is not easy to see why the confessions of the principal should not be received as evidence establishing his own guilt; yet, such it seems is the cautious tenderness of the law as to the lives or liberty of the accused, that it

Self *v.* The State.

is not permitted to the State to rely upon the confessions of the principal to establish his guilt as preliminary to an investigation of the guilt of an accessory before the fact. We do not, however, commit ourselves to this doctrine, nor is it necessary to determine it in this case.

The question in the present case is not whether the confession of Simpson, the principal, made after the offense was committed, were proper evidence, but were the threats made by him before the offense was committed competent evidence either to establish his guilt or to fix the grade of his offense if his guilt was established by other proof? It is clear that if Simpson had been on trial for the murder of Mason, his previous threats would have been competent and material evidence in determining both his guilt and the grade of the offense. But we have seen that the proceedings are to be conducted in the same manner as if Simpson, the principal, was on trial, and that his guilt must be established before any case can be made against the accessory. The threats made by Simpson, which are objected to as incompetent, have no reference to or connection with the accessory. They are declarations which manifest the malice which he cherished towards Mason, and which in no degree implicates the defendant. They furnish strong evidence upon the question of his guilt, but they furnish none as to the guilt of defendant as his accessory. When, therefore, the single inquiry is as to the guilt of the principal, can it be said that evidence which is material on that inquiry is incompetent, because it may

establish his guilt and thereby produce a result at which the investigation of her guilt as an accessory may commence? Is the State to be deprived of proof that is clearly legitimate to fix guilt upon the principal murderer, and which can have no other effect because the proof consists of his own previous declarations and threats? Are these declarations and threats less competent evidence than would be proof that Simpson had prepared combustible materials and was seen immediately before the burning on his way in the direction of the store-house? These facts would be legitimate evidence, not because they fix guilt upon defendant as accessory, but because they look to the guilt of the principal. So, also, the declaration and threats of Simpson are competent, not because they tend to illustrate the guilt of defendant as accessory, but because they tend to establish the guilt of the principal.

It results from the nature of the case, involving as it does a double trial, that in ascertaining the guilt of the principal, which is the preliminary inquiry, the same evidence is competent that would be admitted if the principal were on trial. To this general proposition there seems to be the exception, that the declarations or confessions of the principals made after the commission of the offense, cannot be used against the accessory for the purpose of fixing the guilt of the principal, but as already intimated, the reason for this exception is not very apparent.

This is the rule laid down in the case of *Hensley* v. *The State*, 9 Hum., 243, in which it was held that

"it was a legitimate defense for the prisoner to show that another, and not herself, perpetrated the crime with which she was accused, and any proof would be legitimate to establish this fact, which would have been legal against the individual upon whom it is attempted to place it if he had been on trial therefor." The proof by which the defendant sought to fix the offense upon another, consisted of declarations of that other made previous to the commission of the offense. This authority was allowed in the case of *Sible* v. *The State,* 3 Heis., 137, in which it was said "the case of *Hensley* v. *The State* goes quite as far as we think it consistent with the well-established rules of evidence to go, and we are not inclined to extend the principle of allowing declarations of third persons to be given in evidence, either to criminate or exonerate a defendant in criminal prosecutions." In the present case the declarations of the principal are not introduced to establish the offense of committing or inciting the murder with which the accessory is charged, but only for the purpose of criminating the principal by his own declaration made before the offense was committed.

We are, therefore, of opinion that the threats made by Simpson were properly admitted as evidence, and that they were competent as well to establish the guilt of the principal as to fix the grade of the homicide.

It is insisted for defendant that the court below erred in admitting certain confessions of defendant as evidence before the jury. It appears in evidence that A. W. Walker, the Sheriff of Greene county, and foreman of the jury of inquest empanelled upon the death

of Mason, proceeded to arrest defendant for the murder of Mason soon after learning that George Simpson, who was a brother of defendant, had been killed at Morristown in an attempt to arrest defendant, several articles of goods with Mason's marks on them were found concealed in defendant's house. She was carried by the sheriff, under guard, from her house, situated near the railroad depot, where was Mason's store-house, to the court-house in Greeneville, and placed in one of the clerk's rooms. She was told by the sheriff of the killing of her brother the day before at Morristown, and was assured by him that she would be protected from violence while on the way to the court-house. After reaching the court-house the sheriff sent several persons to defendant's house to search for other goods. An excited crowd had collected in the court-house and around it when the parties so sent returned with about two hundred dollars worth of Mason's goods, found buried in defendant's yard and near to her house. Upon the return of these parties with the goods, the sheriff went into the room where defendant was under guard, and said to her: "Beck, so far as you are concerned, you are gone up. Nothing you can say will do you any good. The only thing that will do you any good is to get upon your knees and go to good hard praying, and pray in earnest, too." Witness thinks he may have said also to her, "to make her peace with God." He said further to her, "now these people are in distress about these things, and you can relieve them if you will." He says he made no promise or

Self *v.* The State.

threats to her—none in the world. Witness says he was crying, and that his manner was mild. She got to crying, too, before witness got done talking; and after he got done talking, she said if witness would take her out to herself she would tell him. He took her into the court-room, upstairs, no one present. She was crying when she made the confession. Defendant's counsel here objected to the introduction of the confession. The court intimated strongly that it could not be admitted, but said he would take the matter under consideration during the night, and in the morning he might admit it. The next day witness was allowed by the court to proceed to detail the confession to the jury. He said: "When I had taken defendant out of the clerk's room into the upper court-room, she said to me: George had come back to her the day before the fire and got her to go that day and make an arrangement with Jo Mason to stay all night with him, so that he could come into the store and leave. That she had gone down that day and made the arrangement. That night, after dark, she and George started down toward the store. Before they got there the train passed down (think it passed down about 8 o'clock P.M.) She stopped at a little unfinished house of Heirsh's, behind the depot from the store, and George went on to the store to see if the way was clear. He was gone a long while— half or three-quarters of an hour—when he came back and told her he had killed Mason. She replied to him: 'You haven't, or it isn't possible, you have done that.' He told her if she didn't believe it go

with him to the store and see. She went on with him to see. Saw Mason's little paper boxes that held his money on the counter, and George said Mason was not near so rich as people said he was; and if she wanted to see Mason she could go and look into the back-room. George then filled a sack full of goods and went off, and left her sitting on a nail keg in the store-room. When he came back, after some-time, he said to her: She would have been in a pretty fix if any one had come there, with the store unlocked. His long legs would have saved him, but she would have been in a pretty fix."

At this point in her confession one of the jury of inquest came in for the sheriff, who took defendant down with him to the lower room, where the jury of inquest was sitting, and after getting there she finished her confession before the jury, but without being re-sworn, as she had been sworn and examined by the jury as to Mason's death a few days before.

Defendant objected to the introduction of that por-tion of the confession made before the jury, which ob-jection was sustained. The record does not show the residue of the confession.

Defendant's counsel then asked the court to exclude all of the confession, as a part had been excluded, but the court refused.

Did the court err in allowing the confession made by defendant to the sheriff to go to the jury as evidence? No one accused of crime can be required to criminate himself, but deliberate confessions, freely and voluntarily made, without the influence of hope

or fear in any degree, are generally received as the most effective proof, and for .the obvious reason that such confessions are presumed · to be truthful because made against the interest of the party.   But unless confessions are made freely and voluntarily, without the influence of hope or fear, they are not received as competent evidence.   When confessions are offered as evidence, their competency becomes a preliminary question, to be determined by the court.   This imposes upon the presiding judge the duty of deciding the fact whether the party making the confession was influenced by hope or fear.   This rule is so well established, that if the judge allow the jury to determine the preliminary fact, it is error, for which the judgment will be reversed: *Boyd* v. *The State*, 2 Hum., 39.   These are elementary principles too long established and followed to be now-questioned.

In the present case the judge first determined that the confession was not freely and voluntarily made, but upon reconsideration, and after further examination of the sheriff, he changed his mind, and permitted the confession to go to the jury.

We are to determine, upon all the facts detailed by the sheriff, and by the surrounding circumstances, whether the judge erred in finally coming to the conclusion that the confession was freely and voluntarily made by defendant.

Defendant was under arrest on a charge of being implicated in the murder of Mason.   The goods of Mason found in her house at the time of the arrest pointed strongly to her guilt.   Her brother, George

Simpson, charged with the same offense, had just been killed, without being brought to trial. She was under guard in the court-house, with an excited crowd anxious as to the developments pointing to her guilt. A crowd was sent by the sheriff to her premises to search for further evidence of her guilt. In a short time the crowd returned with strong corroborative proof in the shape of boxes of Mason's goods found buried in her yard. Such a development necessarily intensified the excitement already pervading the crowd. In the crowd were the two men who had pursued, overtaken, and killed her brother. She was so situated that she could see and understand the excited temper of the crowd.

These were some of the surrounding circumstances when defendant was approached by the sheriff, who had arrested her, and who, as foreman of the jury of inquest, had examined her on oath three days before touching her knowledge of the means by which Mason was murdered and burnt up in his storehouse. The sheriff says he was greatly wrought upon, and that he was shedding tears, and that his manner towards her was gentle and mild. He says he made no promise or threats to her. But we are to judge of his manner from the language employed by him; and in connection with the agitated and excited state of his feelings, which had moved him to tears. His opening remark was: "Beck, so far as you are concerned, you are gone up." This was said when the crowd returned with the goods found buried in her yard. He meant, no doubt, to announce to her that

in view of this new proof, her guilt was placed beyond any further doubt; hence, he added, "Nothing you can say will do you any good." He thus tells her that her case is hopeless, and that it is useless for her to say any thing, as it will do her no good. He adds: "The only thing that will do you any good is to get on your knees and go to good hard praying, and pray in earnest too."

Defendant might well have asked the question just then: Why this urgent advice to resort to prayer? Is my case not only so hopeless, but is my danger so imminent and threatening that my only hope is in immediate and earnest prayer? But the next remark was calculated to excite her still more in the same direction.

"Now, these people are in distress about these things, and you can relieve them if you will." When this remark was made he was so wrought upon that he was crying, and, he says, she, too, was shedding tears; and then it was that she consented to follow his advice, and to make a confession.

The question then arises, why did she at that moment consent to confess? Was it the deliberate, free, and voluntary impulse of her mind, or was she impelled under the pressure of threatened danger, and with the hope of escaping the vengeance of an infuriated crowd, to accede to the suggestion of the sheriff? The words to which she had been listening fell from one high in authority; they were delivered with emphatic positiveness; they were full of significance; they pointed darkly to impending danger; they

held out obscurely that there was hope in an immediate confession. These impressive words of the sheriff, in view of the fate of her brother, and of the manifest temper of the crowd by which she was surrounded, most probably struck terror into her soul, agitated her with alarm, and influenced her, with the hope of appeasing the angry crowd, to make confession. Whether the sheriff intended it or not is immaterial. We are satisfied that his manner and his language, and the circumstances which surrounded her, excited in her fears of imminent danger, which she hoped to escape by confession; and that she had good cause for alarm is fully shared by the fact that a few hours later, on the same day, the sheriff had to suppress demonstrations in the crowd which threatened her with violence.

We are, threfore, of opinion that the court below erred in admitting the confession as complainant's evidence.

As the judgment must be reversed, and a new trial granted for this error, we deem it unnecessary to notice other minor questions which have been discussed.